**SIGNED THIS: June 12, 2012**

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TRAVIS R. BRYANT, | ) | Case No. 10-81783 |
|         Debtor. | ) | |
| | ) | |
| CHARLES BURDICK, | ) | |
|         Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 10-8108 |
| | ) | |
| TRAVIS R. BRYANT, | ) | |
|         Defendant. | ) | |

O P I N I O N

This matter is before the Court after trial on the complaint filed by Charles Burdick, the Plaintiff (BURDICK), against Travis R. Bryant, the Debtor (DEBTOR), seeking a determination that the debt arising from his agreement with the DEBTOR to restore his 1931 Model A Ford, is nondischargeable under sections 523(a)(2)(A), (a)(4) and (a)(6) of the Bankruptcy Code.

*Background*

BURDICK, a resident of East Moline, Illinois, owned a 1931 Model A Ford which his grandfather had purchased in the late 1960's. His grandfather had, over the years, purchased numerous parts in anticipation of someday having it restored. During that time, the vehicle was stored and no attempts at fixing it up were made. In November, 2005, BURDICK, deciding the time had come, contacted Abrahams Machine Service, Inc., in Davenport, Iowa, a company with expertise in rebuilding antique engines. The DEBTOR, a machinist employed by Abrahams, took BURDICK'S call. As a result of the conversation, BURDICK agreed to employ the DEBTOR, individually, to remove and rebuild the car's engine.[1] For that work, the DEBTOR was to be paid $500. The parties also discussed the car's restoration, agreeing that the DEBTOR would do the necessary body work, using, adding or replacing to the trove of parts which had been acquired by BURDICK'S grandfather. The terms of compensation for the body work, however, were not nailed down.

The DEBTOR picked up the car and assorted parts in December, 2005, receiving $500 from BURDICK. At that time, the DEBTOR was given four new tires and rims. The DEBTOR transported the car to his leased premises in a warehouse at 720 W. River Drive, Davenport. From December, 2005, to June, 2006, the DEBTOR removed the motor and began the rebuild. He removed the crank shaft and pistons and rod assemblies, honed the cylinders and performed a valve job. In June, 2006, the DEBTOR requested and BURDICK

---

[1] No explanation was offered at trial as to why BURDICK decided to hire the guy who happened to answer the phone at Abraham's, instead of carrying out his original intent to hire a reputable company.

paid him an additional $1,000. That payment was mainly for parts, but also included compensation for the DEBTOR'S labor. The parties agreed on a completion date of July 4, 2006. That month, the parties talked on the phone and the DEBTOR advised BURDICK that he needed an additional six months to complete the requested work.

The DEBTOR testified that in August, 2006, he transported the metal shell of the car to Walcott, Iowa, to Aeroblast to be sandblasted. Aeroblast's charge for the work was $550, which was paid by the DEBTOR from the additional funds received from BURDICK in June, 2006. The DEBTOR'S recollection of dates and time frames was fuzzy at best. According to the DEBTOR, the shell may have remained in Walcott for several months, although he failed to explain why.

The DEBTOR, having encountered financial difficulties, testified that he lost the lease to the warehouse space on River Road in October, 2007. He moved many of the parts that were there, and presumably the engine, to a garage that he was leasing at 217 18th Avenue, Rock Island, Illinois. (His testimony about the engine's location was inexplicably unclear and he was not asked to clarify that testimony.) When he picked up the shell from Aeroblast, not having space of his own, he sought the permission of his brother, Kevin Bryant, to keep the car in his garage. Kevin agreed and the DEBTOR took it to his brother's residence. The DEBTOR did not explain why he did not move the shell to the rented garage on 18th Avenue. The DEBTOR testified that he continued to work on the car in Kevin's garage. In his testimony, the DEBTOR made no statement that he ever moved the engine to Kevin's garage.

BURDICK testified that in the beginning, he regularly visited the River Road

warehouse to check on the DEBTOR'S progress. He stated that he last saw the car at the warehouse in March, 2007. He observed that the engine had been removed and was sitting alongside the car. He noted that the body work had only just begun. BURDICK testified that when he visited the warehouse in September, 2007, he found it locked up and empty. He immediately called the DEBTOR and found him to be evasive about the car's whereabouts. BURDICK testified that the DEBTOR eventually represented that he had taken the car to Toby's Body Shop in Walcott, Iowa. The DEBTOR did not tell BURDICK that the shell was at Kevin's garage or that the engine and parts were at a rented garage. His suspicions aroused, BURDICK checked into the DEBTOR'S representation and discovered that there was no body shop named "Toby's" in Walcott. Thereafter, BURDICK repeatedly called the DEBTOR, leaving many messages, but the DEBTOR never called or spoke with BURDICK again.

BURDICK, unable to communicate with the DEBTOR, went to the police for assistance in recovering his car. Detective James Meier, with the City of Davenport Police Department, was in charge of the investigation. Meier testified at trial. From his interview with the DEBTOR and his brother Kevin, Meier was advised that the Model A shell was picked up from Kevin's garage by two men who represented to Kevin that they were authorized to do so. The police were unable to trace or recover the Model A body or engine. Numerous parts, including the cushion for the rear seat, the transmission, four tires and three rims, muffler, exhaust manifold, hood, fly wheel, two headlight assemblies, vinyl top, radiator support, floor mat and two fenders were returned to BURDICK by the

4

DEBTOR, after the police became involved.  The engine was not returned.

In 2008, BURDICK brought suit against the DEBTOR in state court.  While that matter was still pending, the DEBTOR filed a Chapter 7 petition on June 1, 2010.  The DEBTOR listed BURDICK as holding an unliquidated, unsecured claim for damages in the amount of $40,000.[2]  BURDICK filed this adversary proceeding seeking a determination that his claim for damages against the DEBTOR is excepted from discharge pursuant to sections 523(a)(2), (a)(4), or (a)(6).  The matter was tried before the Court on the afternoons of November 17, 2011, and January 19, 2012.  BURDICK, the DEBTOR, the DEBTOR'S brother, Kevin, Detective Meier, and Cary Veit, an appraiser, testified at the trial.

BURDICK introduced into evidence a list of some seventy-eight parts, with prices obtained from a catalog published by MAC's Antique Auto Parts, a well-recognized seller of antique auto parts and accessories for Ford vehicles, for many of the parts.[3]  BURDICK admitted that the DEBTOR conveyed to him an offer by a third party to purchase the car for $10,000, but that he declined to sell it, because of its sentimental value.

Kevin testified that after the DEBTOR brought the car to his garage in late October, 2007, the DEBTOR came out and worked on it on about a dozen different occasions.  According to Kevin's testimony, one evening in late November, two men knocked on his door and informed him that they were there to collect the car and finish putting it together.

---

[2] No explanation was offered as to how that amount was arrived at.

[3] In preparing the list, BURDICK worked from a running list of parts which his grandfather had maintained through the years, essentially updating the values from the 2005 MAC's catalog.  BURDICK testified that he was unable to find some of the parts in the catalog and that no replacement value is listed for those.  The total amount shown for the parts which were valued was $2,743.93.

One of the men, introducing himself as "Keith," carried a document which appeared to Kevin to be an invoice, and offered to call in the police, if necessary. Both men were knowledgeable about the car and Kevin assumed, without asking, that they were authorized to take the vehicle. The men knew that the car had no motor, no front suspension, no floors, no roof and that everything from the firewall forward was missing. Kevin described the men as clean-cut and identified their vehicle as a "dually" (4 wheels on the rear axle) pickup truck with Illinois license plates and a trailer with Iowa plates. Kevin was very clear that the men only hauled away the car's metal body, which he helped load onto their trailer. The engine, which was not even at his garage, was not taken by the men. Kevin testified that within a day, he called the DEBTOR to let him know that the car had been picked up. Upon realizing that the car had been relinquished to two men whose identities were completely unknown, the DEBTOR, according to Kevin, became incensed and a rift developed between the two brothers that was not mended until their father's death.

The DEBTOR testified that at the time the car disappeared, most of the motor had been rebuilt, but that it had not been installed in the car. He had done some of the body work and some had been done by Toby's Auto Body of Davenport, in an arrangement with the DEBTOR whereby the two agreed to exchange labor.[4] Contrary to his brother's testimony, the DEBTOR testified that the two men who took the shell also took the engine and some loose parts from Kevin's garage. No testimony was offered to explain the

---

[4] The DEBTOR offered no corroboration of the work allegedly performed by Toby's. BURDICK offered no evidence to refute the DEBTOR'S testimony. According to public records, a business called Toby's Collision Repair Center is located at 6308 W. Kimberly Road, Davenport, Iowa.

6

inconsistency between the two witnesses. No testimony was offered by the DEBTOR as to how, when or why the engine was relocated to Kevin's garage.

The DEBTOR testified that when he took the car to Kevin's in October, 2007, he had not spoken with BURDICK for months. The DEBTOR explained that he stopped answering BURDICK'S calls because he had nothing new to tell him. The DEBTOR admitted that after Kevin phoned him in December, 2007, he did not inform BURDICK that the car was no longer in his possession. He testified that he believed that the men who picked up the car and the engine must have been affiliated with a body shop that had been engaged by BURDICK to complete the work on the car. The DEBTOR surmised that the location of the car had been disclosed to BURDICK by "Glen," the owner of the River Road warehouse, who was aware that the car was being housed in Kevin's garage. The DEBTOR admitted that, to his knowledge, a fully restored Model A would have a value of $12,000.

Cary Veit, of Veit's Vettes & Collector Cars, testifying on BURDICK'S behalf, attributed a value of $11,443.93 to the car as of May 30, 2010, the date that he rendered his appraisal. His opinion of the value was based only on the pictures which were taken of the vehicle back in early December, 2005, when the DEBTOR first picked up the vehicle, and any information which was provided from BURDICK'S attorney. Veit testified that he could not recall what that additional information might have been, and as a general rule, when he appraises a vehicle based on pictures alone, he tends to assume the worst. In particular, Veit could not remember whether he was advised that the car was inoperable and that it was likely that his appraisal was based on the engine being in running

7

condition. In his opinion, the reduction in value resulting from a rebuild of the engine would be no more than $2,000.

*Analysis*

In order to effectuate the "fresh start" policy of the Bankruptcy Code, exceptions to discharge are narrowly construed against the creditor and liberally in favor of the debtor. *In re Morris*, 223 F.3d 548 (7th Cir. 2000). The creditor carries the burden to prove each element of the exception to the dischargeability of its debt by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). BURDICK'S adversary complaint states three alternative grounds for nondischargeability under sections 523(a)(2)(A), 523(a)(4) and 523(a)(6).

It is not unusual in cases of conversion of property for the complaining creditor to allege a trio of alternative grounds of nondischargeability under sections 523(a)(2)(A) for fraud, (a)(4) for fiduciary fraud, and (a)(6) for willful and malicious injury. *See In re Beetler*, 368 B.R. 720 (Bankr.C.D.Ill. 2007). Like the creditor in *Beetler*, BURDICK never specifies which of those alternative theories he believes provides his strongest claim. In this Court's view, simple conversion, unaccompanied by fraudulent inducement, fits most cleanly under section 523(a)(6). It has been noted, based in part on legislative history, that a cause of action under section 523(a)(6) "subsumes" a claim for willful and malicious conversion.[5] *In re Perto*, 2011 WL 4544038 at *6 (Bankr.N.D.Ill. 2011). The conversion of another's property without the owner's knowledge or consent, done intentionally and without justification or excuse, is a willful and malicious injury that fits squarely within the scope

---

[5] The Senate Committee Report accompanying the Bankruptcy Code's "willful and malicious injury" language states that the paragraph provides that "debts for willful and malicious conversion" are nondischargeable. S. Rep. No. 95-989, at 79 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5865.

8

of section 523(a)(6). *In re Blackburn,* 415 B.R. 668, 683 (Bankr.N.D.Ill. 2009) (citing cases); *In re Kimzey,* 761 F.2d 421, 424 (7th Cir. 1985).

Proving conversion is ordinarily a two-pronged endeavor. It may be proved with evidence that the debtor committed the act of conversion or participated in the conversion by instigating, aiding, assisting or conspiring with another.[6] Conversion may also be proved with evidence that the debtor received the proceeds or knowingly benefitted from the conversion or the proceeds. *Matter of Robison,* 86 B.R. 182, 184 (Bankr.W.D.Mo. 1988).

It should be noted, however, that where a loss is caused, not intentionally, but only by negligent or reckless conduct, section 523(a)(6) does not apply. *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Acting with an intent to injure or knowledge that injury is certain or highly likely is the key. Acts or omissions done out of ignorance or carelessness do not suffice. It follows that a debtor lawfully in possession of the property of another who intentionally destroys it or who sells it or knowingly transfers it so that the owner is deprived of its use and benefit may not discharge the liability. On the other hand, if the property of another goes missing while in the lawful possession of the debtor, because the debtor carelessly lost it or because it was stolen, the discharge is ordinarily not denied. Even though the injury to the creditor is the same in both cases, permanent loss of the property, the liability is nondischargeable only where the debtor intended or knew the harm would occur.

The evidence admits of several possible scenarios. First, Kevin's story, though

---

[6] Where agents of a corporation or other organization commit conversion, a person in a superior position may be held liable upon proof that he authorized or ratified the conversion. *Airlines Reporting Corp. v. Pishvaian,* 155 F.Supp.2d 659, 666 (E.D.Va. 2001).

9

incredible, may be true. Perhaps some thief somehow got wind that a Model A shell was sitting in Kevin's garage, and could be gotten with a brazen subterfuge. If so, it may have been stolen without any knowledge or complicity of either the DEBTOR or Kevin, who would both be innocent of any intentional wrongdoing. Second, Kevin could be the bad guy by himself. He could be lying about two strangers picking up the Model A. Kevin may have arranged a sale of it without the DEBTOR'S knowledge and made up the story he told to cover his tracks. In this event, the DEBTOR would be innocent of any wrongdoing. Third, the DEBTOR and Kevin could have acted in concert to sell the Model A and invented a story to hide the conversion. If so, the act of conversion by the DEBTOR would result in a judgment of nondischargeability. Fourth, the DEBTOR could have acted alone, without Kevin's knowledge, to sell the Model A. The two "strangers" who picked it up may have been known to and arranged by the DEBTOR all along. In that event, dischargeability would be denied.

What actually happened to the Model A remains a mystery. BURDICK was unable to prove who took it or where it went. There was no direct evidence that the DEBTOR and his brother conspired to dispose of the Model A. They both denied it at trial. No evidence was presented of any suspicious or unusual conversations or communications between the brothers or with any third person concerning the car. However, the story told by the DEBTOR'S brother, Kevin, is too fantastic to believe.

The Court finds the story about two mysterious men picking up the Model A to be a fabrication. The failure of the DEBTOR and Kevin to get their "facts" straight puts the lie to it. The biggest inconsistency concerns the Model A's engine. The DEBTOR testified that after he lost the warehouse lease, he moved the shell to his brother's garage, and

"some of the parts" to a leased garage at 217 18th Avenue in Rock Island. He failed to specify where the engine went. Kevin testified that the only thing taken from his house by the two strangers was the shell, which he helped load onto the trailer. The DEBTOR, however, testified that both the shell and the engine were picked up by the strangers. He never explained how they were able to accomplish that feat when the engine supposedly was never at Kevin's garage and was, instead, at a different location, presumably a private garage no one could have known about unless the DEBTOR purposefully disclosed the location. Kevin's testimony that he never had possession of the engine, and the DEBTOR'S failure to give a plausible explanation as to how the two strangers got hold of it, is strong proof that the DEBTOR was in on the scheme and is not merely an innocent victim of his brother's misappropriation.

A second flaw in their story concerns Kevin's representation that in November, 2007, the DEBTOR "worked on the car" while it was in his garage on about a dozen occasions. The DEBTOR testified that the shell had been sandblasted, that Toby's had done the body work and that it just needed to be painted. If so, and if the engine was not there, then what "work" was the DEBTOR doing in Kevin's garage every other day?[7] Neither the DEBTOR nor Kevin offered any explanation.

Furthermore, the DEBTOR'S behavior does not square with his stated beliefs after he learned the vehicle had been taken from Kevin. He testified that he thought BURDICK had made arrangements to have the car finished by someone else, yet he never contacted BURDICK to find out. He testified that he thought Glen, his former landlord, might have

---

[7]There was no evidence that Kevin's garage contains a specialized paint room that would be needed to properly paint the body of an automobile.

told BURDICK the shell was at Kevin's garage, yet he never contacted Glen to ask him. He said he did not call the police because he was trying to locate the car on his own, yet he never explained what he actually did, if anything, in an effort to find it. And he did not pursue the most obvious lead by simply calling BURDICK, his customer. The DEBTOR also lied to Detective Meier when he told the detective that he thought the Model A was at his brother's garage, even though the DEBTOR knew from Kevin that it was gone.

It is true that no evidence was offered that the DEBTOR or Kevin received money or anything else of value for the car. In the Court's opinion, however, this evidentiary gap is outweighed by the evidence that supports a finding that the story told by Kevin and affirmed by the DEBTOR was fabricated, from which it follows that the vehicle was transferred with his knowledge. The Court finds by a preponderance of the evidence, that BURDICK'S loss of the Model A was caused by the DEBTOR'S intentional act of conversion.

BURDICK contends that his debt resulting from conversion of his car is nondischargeable under section 523(a)(6) of the Bankruptcy Code, which excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). In order to establish the nondischargeability of a debt under this provision, a creditor must prove the following three elements by a preponderance of the evidence (1) that the debtor intended to and caused an injury to the creditor's property interest; (2) that the debtor's actions were willful; and (3) that the debtor's actions were malicious. Under the Supreme Court's decision in *Kawaauhau v. Geiger*, "willful" is defined to mean conduct intended to cause harm, not

12

merely intentional conduct that results in an injury that was not intended. The term "malicious" involves acting in conscious disregard of one's duties or without just cause or excuse. *Matter of Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). In essence, a willful and malicious injury is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act. *Jendusa-Nicolai v. Larsen*, 677 F.3d 320 (7th Cir. 2012). A conversion of property can give rise to a nondischargeable debt under section 523(a)(6).

The conversion here was an intentional harm to BURDICK'S property interest without legal justification that, as such, fits squarely within the scope of section 523(a)(6). The DEBTOR'S liability to BURDICK for the conversion is a debt for willful and malicious injury to property that is nondischargeable. With this determination of nondischargeability under section 523(a)(6), it is not necessary to address the alternatives asserted by BURDICK under sections 523(a)(2) and (a)(4).

Turning now to the quantification of the unliquidated debt, the starting point is Veit's opinion that the Model A was worth $11,443.93 as of May 30, 2010. Veit admitted that his valuation would have to be reduced by $2,000 since the vehicle was not in operating condition. In addition, a large number of loose parts were given to the DEBTOR, many of which were returned.

The description of Veit's appraisal report is informative. It states:

Body has wrinkles and some dents. All sheet metal is original and in mostly good overall condition for age. Vehicle has been repainted but it's old and of low quality. All original, no restoration has been performed at the time I've viewed photos of car.

Veit acknowledges that his appraisal was based solely on photographs of the car taken on

13

the day that possession of it was first transferred to the DEBTOR. He never actually saw or inspected the Model A in person.

Under the circumstances, the value of what was taken is not susceptible to an exact mathematical calculation. Valuation is an art not a science and the circumstances of Veit's appraisal were far less than optimal. In the Court's opinion, a fair valuation of the Model A body and the engine, in its nonoperating condition, is $6,000. In addition, BURDICK is entitled to be reimbursed the $1,500 he paid the DEBTOR. Judgment will be entered for $7,500 plus costs of $250.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###